UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 13-24141-CIV-MORENO/OTAZO-REYES
(11-20101-CR-MORENO)

ARMANDO SANTOS,

      Petitioner,

v.

UNITED STATES OF AMERICA,

      Respondent.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Armando Santos' ("Santos") Petition for Writ of Habeas Corpus under 28 U.S.C. § 2255 (hereafter, "Motion to Vacate") [D.E. 1]. This matter was referred to the undersigned by the Honorable Federico A. Moreno, United States District Judge, pursuant to Title 28, United States Code, Section 636 [D.E. 3]. The undersigned held an evidentiary hearing on the Motion to Vacate on March 6, 2014. Having conducted a thorough review of the parties' submissions and having considered the evidence presented at the March 6th hearing, the undersigned RESPECTFULLY RECOMMENDS that the Motion to Vacate be DENIED.

## THE UNDERLYING CRIMINAL CASE

On February 9, 2011, Santos was charged by way of indictment in Case No. 11-20101-CR-FAM (hereafter, "Case 11-20101") with the following crimes relating to Medicare fraud:

    Count 1:    Conspiracy to Commit Health Care Fraud from June, 2007 through March, 2009, pursuant to 18 U.S.C. § 1349.

    Counts 2-5:    Health Care Fraud from June, 2007 through March, 2009, pursuant to 18 U.S.C. § 1347.

> Count 6: Making False Statements Related to Health Care Matters in November, 2007, pursuant to 18 U.S.C. § 1035(a)(2).
>
> Count 7: Making False Statements Related to Health Care Matters in July, 2007, pursuant to 18 U.S.C. § 1035(a)(2).

[Case 11-20101, D.E. 3].

According to the indictment, Santos was a registered nurse employed by a local home health agency, whose duty was to provide skilled nursing services to patients and maintain proper documentation of all treatments provided to patients. Id. at 5. However, Santos submitted false claims to Medicare representing that he had provided home health services to C.P. and K.D. Id. at 8-9. Santos also falsely reported that he had injected Medicare beneficiaries C.P. and K.D. with insulin. Id. at 9-10.[1]

On February 17, 2011, attorney Mauricio L. Aldazabal ("Aldazabal") was appointed as defense counsel for Santos pursuant to the Criminal Justice Act ("CJA") [Case 11-20101, D.E. 9]. Jury trial commenced on May 24, 2011 before Judge Moreno, in which Santos testified. On May 26, 2011, the jury returned a verdict finding Santos guilty as to all seven counts charged against him [Case 11-20101, D.E. 60].

At the sentencing hearing on August 8, 2011, Judge Moreno made the following finding:

> The Court independently of the jury finds that on the main things, whether he participated in the fraud and also whether he injected De La Cruz and Pizzorno with insulin, on those particular facts, the defendant was not truthful. Therefore, for that reason, there will be the obstruction of justice enhancement. Therefore, the [Sentencing G]uidelines – I will adopt the guidelines of 41 to 51 months in this healthcare fraud where the defendant testified, and in my opinion and my finding is he lied.

See Transcript of Sentencing Proceedings [Case 11-20101, D.E. 87 at 8-9]. Judge Moreno sentenced Santos to a term of 10 years as to Counts 1-5 (with an upward departure from the Sentencing Guidelines) and a concurrent term of 5 years as to Counts 6-7 [Case 11-20101, D.E.

---

[1] C.P. is Caridad Pizzorno and K.D. is Klebe De La Cruz.

2

71].

On August 8, 2011, attorney Clayton R. Kaeiser ("Kaeiser") was substituted as counsel of record and Aldazabal was discharged from the case [Case 11-20101, D.E. 72]. Santos appealed the Judgment on August 19, 2011 [Case 11-20101, D.E. 74]. The Eleventh Circuit Court of Appeals affirmed on August 16, 2012 [Case 11-20101, D.E. 97]; United States v. Santos, 481 F. App'x 574 (11th Cir. 2012). Santos did not file a petition for a writ of *certiorari* with the United States Supreme Court [D.E. 1 at ¶ 9].

## THE MOTION TO VACATE

On November 14, 2013, Santos timely filed the Motion to Vacate asserting five claims:

I. Santos was denied his fifth and sixth amendment rights because his trial attorney was ineffective in failing to properly prepare for the cross-examination of expert witness Diane Krieger.

II. Santos was denied her fifth and sixth amendment rights because his trial attorney was ineffective in not properly preparing for the cross-examination of C.P. and government witnesses testifying in regards to C.P. in Santos' case for trial.

III. Santos was denied his fifth and sixth amendment rights because his trial attorney was ineffective in signing an untrue stipulation.

IV. Santos was denied his fifth and sixth amendment rights because his trial attorney was ineffective in not properly objecting to misstated facts regarding the OASIS and undisclosed nursing notes in evidence.[2]

V. Santos was denied his fifth and sixth amendment rights because his trial attorney was ineffective in not properly preparing for closing argument.

[D.E. 1 at 3-10].

## STANDARD OF REVIEW

A claim for ineffective assistance of counsel under 28 U.S.C. § 2255 is subject to the

---

[2] OASIS stands for Outcome and Assessment Information Set and is a form that home health agencies must complete under Medicare. See http://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/OASIS/index.html.

3

two-pronged test set out in Strickland v. Washington, 466 U.S. 668 (1984). Strickland requires a criminal defendant to show that: (1) counsel's performance was deficient and (2) the deficiency prejudiced the defendant. Id. at 687.

As to the first prong, deficient performance means performance outside the wide range of professionally competent assistance. Id. at 690. The judiciary's scrutiny of counsel's performance is highly deferential. Id. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "In reviewing counsel's performance, a court must avoid using the distorting effects of hindsight and must evaluate the reasonableness of counsel's performance from counsel's perspective at the time." Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (citing Strickland, 466 U.S. at 689). In order for counsel's performance to be considered unreasonable, it must be such that "no competent counsel would have taken the action that [] counsel did take." Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001). "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler, 218 F.3d at 1316 (citing Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998)).

As to the second prong, a defendant establishes prejudice by showing that, but for counsel's deficient performance, there is a reasonable probability the outcome of the proceedings would have been different. Strickland, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. Id.

A defendant must satisfy both the deficiency and prejudice prongs set forth in Strickland to obtain relief on an ineffective assistance of counsel claim; failure to establish either prong is fatal and makes it unnecessary to consider the other one. Id. at 697. The Eleventh Circuit has recognized that, given the principles and presumptions associated with ineffective assistance claims, "the cases in which habeas petitioners can properly prevail are few and far between." Chandler, 218 F.3d at 1313 (citing Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995)). The burden of persuasion on the movant is preponderance of the evidence. Id.

## FINDINGS OF FACT

The following findings of fact are based on the witness testimony at the March 6th evidentiary hearing as well as documentary evidence. The undersigned has made credibility determinations as to each of the witnesses, namely: Santos and Aldazabal.

**A. Santos**

1. The undersigned finds Santos' testimony to have been evasive, inconsistent and untruthful. Many of the explanations that Santos gave for the positions he has taken on the Motion to Vacate made no sense. Indeed, as to several of those positions, Santos ultimately had to admit that the facts do not support them. Moreover, Aldazabal's credible testimony contradicted many of Santos' not credible assertions.

2. Santos' testimony on direct examination appeared to closely follow a script. On two occasions when Santos deviated, his counsel repeated the question in order to obtain the desired answer. The colloquy went as follows:

```
Q. Did you have a role in helping Mr. Aldazabal prepare your case for trial?
A. Yes.
Q. You had a role in helping Mr. Aldazabal prepare your case for trial?
A. Oh, no, no, no.
```

See Transcript of Hearing on Motion to Vacate (hereafter, "Transcript") [D.E.15 at 10:16-21].

5

> Q. Did you believe that you had reviewed the entire medical records of Caridad Pizzorno and Klebe De La Cruz prior to taking the stand?
> A. Yes.
> Q. Had you, in fact, reviewed the entire files of Caridad Pizzorno and Klebe De La Cruz prior to taking the stand?
> A. No.

See Transcript [D.E.15 at 14:6-13].

3. On cross-examination, Santos was evasive, took long pauses and gave convoluted answers that made no sense in an effort to avoid obviously unfavorable admissions.

4. At the very beginning of his cross-examination, Santos' testimony bordered on the surreal:

> Q. You talked about Caridad Pizzorno and the fact that in her medical records, you claim there was evidence of her being homebound, correct, you testified to that?
> A. Yes, yes.
> Q. Isn't it true, in that same medical file, there was evidence -- there was no evidence that she was diabetic, correct, not one blood test showed she was diabetic?
> A. It is true that that patient is diabetic.
> Q. That's what you say. But Dr. Bianchi, who was her doctor, did not diagnose her with diabetes back at that time, correct?
> A. We are talking about Caridad Pizzorno?
> Q. Yes.
> A. Caridad Pizzorno was seen, was treated by Dr. Bianchi? Excuse me. I got confused with patient Klebe De La Cruz. Could you, please repeat the question.
> Q. Caridad Pizzorno, in her file, isn't it true that Dr. Bianchi did not diagnose her with diabetes? Correct?
> A. Repeat the question, please.
> Q. What don't you understand about the question, sir? You can answer every one of your lawyer's questions just fine.
> A. In Caridad Pizzorno's file, Dr. Bianchi did not have a diagnosis of diabetes.
> Q. There were numerous blood tests in there, correct, that were consistent not with diabetes; isn't that correct, sir?
> A. There were diagnoses there of hyperglycemia and diabetes type II.
> Q. For Caridad Pizzorno, you are saying there was a diagnosis. Just a minute ago, you said there wasn't a diagnosis for Caridad Pizzorno.
> A. The blood tests.
> Q. Yes.
> A. Okay.
> Q. So I'm correct?

6

> A. Yes.

Id. at 26:15-28:2.

5. At a later point in the cross-examination, Santos took a long pause before finally admitting an undisputed event that took place at trial:

> Q. [Betsaidys Emil, another home health provider for Ideal] admitted falsifying the notes and your attorney got that out, correct?
> A. Correct.
> Q. The jury heard that she falsified notes. Your Honor, may the record reflect that it has taken almost 20 seconds for him to answer this yes or no question.
> A. The thing is that I'm trying to remember.
> Q. Okay. Sir, can you just agree with me, the jury heard she falsified notes, Betsaidys Emil.
> A. Yes.

Id. at 44:3-15.

6. Santos testified by way of background that he had become a medical doctor in Cuba specializing in lower digestive surgery; had worked as a doctor in Spain for five years treating approximately 650 diabetes patients; and had become a registered nurse in the United States, working at multiple hospitals and healthcare agencies. He worked as an independent contractor at a home health agency called Ideal for six months in 2007.[3] The 2011 Medicare fraud indictment arose from this work.

7. Santos testified that he only met with Aldazabal three times prior to his trial and spoke to him on the telephone around six times. According to Santos, the in-person meetings lasted 30 to 40 minutes and the telephone calls 10 minutes at most. Santos claimed that he could not meet with Aldazabal as much as he wanted because Aldazabal was very busy and that he was not comfortable with Aldazabal's knowledge of the case as the time of trial approached.

8. According to Santos, Aldazabal never told him that he did not have to testify at

---

[3] Although he saw Medicare patients for Ideal, Santos was employed by an entity called "MES" [Case No. 11-20101, D.E. 84 at 19:15].

7

trial. On cross-examination, Santos claimed that he first learned of his right to remain silent on the last day of trial.

9. Santos claimed that Aldazabal did not properly prepare him to testify on direct because "[t]here were some elements missing there, such as, for example, the interpretation as to the glucose tolerance test and what it meant." See Transcript [D.E. 15 at 13:21-23].

10. Santos also claimed that Aldazabal did not properly prepare him to testify on cross-examination because "there were important elements that were missing, which the jury did not get to hear." Id. at 14:4-5.

11. Santos also claimed that Aldazabal did not provide him with the entire medical records for Caridad Pizzorno and Klebe De La Cruz prior to trial and that he only realized this at the time of cross-examination. At trial, Santos testified on direct examination that he began seeing Caridad Pizzorno on August 26, 2007. See Trial Transcript [Case No. 11-20101, D.E. 68 at 14:20-22; 15:16-22]. On cross-examination, Santos was shown forms signed by him stating that he had provided insulin injections to Caridad Pizzorno on August 19-25, 2007; and he acknowledged that he had performed these visits and that he was changing his testimony. Id. at 28:14-25.

12. Caridad Pizzorno's treating physician, Dr. Bianchi, did not testify at trial; his assistant, Melba Monje ("Monje"), did. Santos testified that Aldazabal should have asked Monje about a diagnosis for mental disability or cognitive defect and a prescription for a walker that were contained in Caridad Pizzorno's medical records. Santos claimed that, as a result of Aldazabal's failure to bring out these facts through Monje, the jury did not learn that these were reasons that qualified Caridad Pizzorno for home health services.

13. Santos testified that Aldazabal did not properly address with the government's

expert, Dr. Diane Krieger ("Dr. Krieger"), the following matters which he feels were important for the jury to know: that Dr. Krieger only reviewed medical records and did not examine Caridad Pizzorno and Klebe De La Cruz; that Dr. Krieger had ordered a glucose tolerance test for Klebe De La Cruz which yielded a positive result;[4] that Dr. Kreiger "made a false inference in testimony by stating that the glucose tolerance test was to determine what type of diabetes it was, which is completely wrong, because the purpose of the test is to find out whether the patient is a diabetic;" and that Dr. Krieger "rendered some testimony stating that she had made a mistake when she had made her assessment of these patients' glucose tolerance tests in a different test." See Transcript [D.E. 15 at 16:12-17:15]. According to Santos, the jury sent a question asking which of the patients had a lab test that had resulted in a positive result for diabetes and "Mr. Aldazabal did not allow that glucose tolerance test into evidence, which was wrong of him." Id. at 17:18-23.

14. Prior to trial, Judge Moreno granted the government's motion to take the deposition of Caridad Pizzorno due to her suffering from terminal cancer [Case No. 11-20101, D.E. 18, 26, 82]. Thereafter, the government filed a Motion in Limine to permit the introduction of Caridad Pizzorno's deposition at trial [Case No. 11-20101, D.E. 35]. On the first day of trial, after the jury had been selected, Judge Moreno addressed the admissibility of the deposition. See Trial Transcript [Case No. 11-20101, D.E. 84]. Aldazabal raised the following objection:

> I requested Jencks and Brady and everything before taking the depo. Yesterday I received a 302 actually, an FBI 302, where there's an interview of Ms. Pizzorno where she is shown a photo spread, which I never received, in which she identifies another individual by the name of Wilbur Sosa.
> At the depo, she, of course, because Mr. Santos was the only one there, identified him as Mr. Santos -- other than the attorneys and the videographer and all of that. And I think that that prevented me from going into that area when she actually

---

[4] Santos claims that, when he tried to bring this to Aldazabal's attention during Dr. Krieger's direct testimony, Aldazabal told him to "be quiet, shut-up, you are not letting me hear." See Transcript [D.E. 15 at 48:13-14].

stated that she knew Mr. Santos and was, you know, and she recognized him, when she had not during the interview in the photo lineup.

Id. at 10:18-11:5; Government Exhibit 2, at 1-2. Aldazabal admitted that he did receive, prior to the deposition, another FBI Form 302, which stated: "PIZZORNO was shown a photo spread with MES employees but did not recognize any of the photos." Id. at 14:20-23; 15:17-18; 16:11-14; Government Exhibit 2, at 3. To cure the problem, Judge Moreno directed the government to draft a stipulation to be read to the jury that Caridad Pizzorno failed to identify Santos on two occasions. Id. at 39:1-5.

15. The stipulation presented to the jury by agreement of the parties read as follows:

> The United States of America and the defendant through his undersigned counsel stipulate and agree to the following: That on June 9th, 2009 and January 19th, 2011 agents showed a photographic lineup to Caridad Pizzorno, which contained the defendant's photograph, and Ms. Pizzorno was unable to identify the defendant.

See Trial Transcript [Case No. 11-20101, D.E. 85 at 36:15-25].[5]

16. Santos testified that this stipulation was untrue. Santos further testified that this stipulation supported the government's theory that Santos did not actually visit her at her home.

17. Santos testified that Aldazabal was not prepared for closing argument because the jury did not hear: the Medicare requirements; that Betsaidys Emil, "began doing false nursing notes;" that "the hours in the insulin log injection were fine;" that Santos was being paid $25 per visit as opposed to $350 per week as argued by the government; that Klebe De La Cruz had been discharged and readmitted to Ideal "and that had to do with the status of care that was done by Betsaidys, not by me initially." See Transcript [D.E. 15 at 24:1-25:2].

18. However, Santos admitted on cross-examination: that a government witness

---

[5] On appeal, the Eleventh Circuit found that the Stipulation, coupled with other evidence presented to the jury, rendered harmless any potential error in the admission of Caridad Pizzorno's deposition. Santos, 481 F. App'x at 577-78.

10

explained to the jury the Medicare requirements for someone being homebound; that the jury heard Betsaidys Emil testify at his trial that she had falsified nursing notes and that Aldazabal attacked her because she had made a deal with the government; that he completed the OASIS form for Klebe De La Cruz on initial certification and for Caridad Pizzorno on recertification.

19.  With regard to Santos' remuneration, the prosecutor did reference the correct figure of $25 per visit a number of times. See Trial Transcript [Case No. 22-20101, D.E. 85 at 131:25-132:1,3; 138:16-17; 141:18-22; 143:3; D.E. 86 at 26:21-22].

20.  At trial, Santos was shown records of his visits to patients Eulalia Garcia and Rolando Arece. See Government Trial Exhibits 4, 3 [D.E. 6-3]. The government pointed out that the entries for July 29, 2007 for these two patients showed Santos being at both of their homes at the same time. See Trial Transcript [Case No. 11-20101, D.E. 68 at 21:3-20].[6]

21.  Santos attempted to explain this overlapping to the jury as follows: "[T]his is a schedule that was established by the agency. So it's within that time frame that you had to go visit the patient. It's not a rigid schedule as I explained earlier. So I could be a minute early or a minute late." Id. at 21:23-22:2.[7]

---

[6] An entry in the form for Eulalia Garcia shows a visit on July 29, 2007 from 6:40 to 7:05. See Government Trial Exhibit 4 [D.E. 6-3 at 2]. An entry in the form for Rolando Arece shows a visit on the same date from 6:00 to 6:55. See Government Trial Exhibit 3 [D.E. 6-3 at 4].

[7] Santos had testified on direct as follows:
> Q. Now, let me ask you about what's called weekly visit time records. Are you familiar with those?
> A. Yes, the weekly visit is a document for the exclusive use of the agency and this is information that lets the agency know at what period of time you visited the patient and it's a confirmation of the visit so that the agency acknowledges, is able to acknowledge that you visited the patient, and it has the patient's signature.
> Q. And what is the purpose then of the weekly visit time record having a time in and a time out column with times?
> A. Okay. This schedule is not a rigid schedule. As I said, this schedule is – this is to inform the agency. This is information that communicates to the agency when approximately, at what period of time you were supposed to visit the patient, but in practice, it could be a few minutes more or a few minutes less.

See Trial Transcript [Case No. 11-20101, D.E. 68 at 19:15-20:5]

11

22.     Santos claims that Aldazabal was ineffective because he did not direct the jury to the insulin logs for Eulalia Garcia and Rolando Arece.  The government explored this contention on cross examination.  Once again, Santos' explanations made no sense:

> Q. So now I'm looking at the daily blood sugar insulin log of Eulalia Garcia. On the date 7/28, it says you administered insulin at 6:30, correct?
> A. Correct.
> Q. And then when we turn to the next page of the exhibit, the daily blood sugar insulin log of Rolando Arece, it shows that on 7/28, you injected him at 6:25.
> A. Correct.
> Q. And you believe your attorney should have directed the jury to the fact that there was no discrepancy here, correct?
> A. Correct.
> Q. Because you are saying this is correct, the 6:30 and the 6:25, that's actually what happened.
> A. Okay.
>                                 ***
> THE COURT: Answer yes or no.
> A: No.
> Q. It is not correct?
> A. Not, it is not correct. If you allow me to, I can give you an explanation.
> Q. Well, you just said to your lawyer that your problem with Mr. Aldazabal is that he didn't mention the fact that these did not conflict.
> A. Correct. The issue is that the jury -- what was not mentioned to the jury is that in the second page of the insulin log, there was no overlapping. This schedule is related to the fact that the agency has to be aware of when it is, at what time it is that I see the patient. But it is impossible -- and I admitted to this -- it is impossible for one to see, every day of the week, every -- all seven days of the week, it is impossible for you to see the patient at the same time going in and leaving. But I repeat, that was for the agency's use, for their knowledge because that's the way they wanted it. This agency went through the process of AHCA and Joint Commission and one of the remarks was about the -- it was about the daily logs and the fact that the nurses could not have any mistakes regarding the times when the patients were distributed throughout.
> THE COURT: You may sit down, Mr. Santos.
> A. But for me, it was -- it was important for me to -- for the jury to hear about the overlapping, and I recognize that from the Government, that it was an error in transcription.
> Q. Sir, what difference would it have made, given that your testimony was you really didn't pay attention to the times, if he had pointed out that there was this consistency?
> A. The differential is that, yes, it would have made a difference because the jury convicted me and he did not make this point clear.

> Q. But are you saying that these are actually correct, the ones that are on the blood sugar insulin log. Is that correct, is that what you are saying?
> A. Yes.
> Q. Okay. So it's your testimony, then, that somehow you were able to be injecting Eulalia Garcia at 6:30 at 52 West 37th Street in Hialeah, Florida, and then five minutes later -- I'm sorry, five minutes earlier, you were injecting Rolando Arece at 1028 Southwest 9th Avenue in Miami, Florida. Do you realize how far those places are away from each other?
> ***
> A. Well, honestly, nobody can make it to a place, you know, very such distance five minutes later or five minutes before that because of the distance, maybe not even in 20 minutes. Because of the distance, plus because of the traffic conditions that we have here in Miami, it is obvious that I cannot be in one place and then the other place five minutes later because of the distance. But as I told you before, that is the schedule set by the agency as far as scheduling when I was supposed to see a patient, that was the range that they gave.
> Q. Okay. But at the end of the day, you weren't saying that that's true? You are not saying that anything is true in the medical records on the times.
> A. Well, as far as the times are concerned, that is not the exact time or hour in which I injected insulin in the patient.
> Q. And that's what your attorney argued in closing argument, isn't it?
> A. What I wanted him to point out was the subject of overlapping.
> THE COURT: Mr. Santos, when you are asked a question, you need to answer yes or no.
> A. Correct.
> Q. He argued that you weren't a very good record keeper, right?
> A. I don't recall that part.
> Q. Okay. Isn't it true that he argued that the fact that there were overlaps didn't really matter because you weren't paying close attention to the times?
> A. Uh-huh, yes, that's true, that's true.

See Transcript [D.E. 15 at 32:11-37:5].

23. On re-direct, Santos testified that what he meant by wanting Aldazabal to explain overlapping was: "The subject matter was the fact that I made a transcription error, and the -- and the agency did not allow people to scratch things out -- scratch things off or to erase things in the -- in the weekly visits, and the main reason was that the documentation was incomplete and the jury did not get to hear that." Id. at 47:17-22.

### B. Aldazabal

24. The undersigned finds credible and accepts the testimony of Aldazabal based on

his demeanor, his candor and the cogency of his responses.

25. Aldazabal has been a lawyer for 33 years. He works as a criminal defense lawyer specializing in federal practice. He worked for three years as an Assistant State Attorney, rising from traffic court cases to major crimes felonies. He is board certified in criminal trial law.

26. Aldazabal has tried approximately 50 cases in federal court and has been accepting CJA appointments since 1984.

27. Aldazabal did not tell Santos that he was too busy to see him. Moreover, a summary of Aldazabal's conferences with Santos, derived from his CJA time records, shows for the pretrial period: 2 meetings at the Federal Detention Center ("FDC"); 4 office meetings; and 10 telephone conferences. See Government Exhibit 1. The office meetings lasted 1.2, 2.5, 2.0 and 4.5 hours; the telephone conferences ranged from 6 minutes to 1 hour. Id. This documentary evidence refutes Santos' testimony that Aldazabal only met with him three times prior to his trial and spoke to him on the telephone around six times; and that the in-person meetings lasted 30 to 40 minutes and the telephone calls 10 minutes at most.

28. Aldazabal did not reject Santos' requests to view the evidence in the case. The evidence was in Aldazabal's office and available for Santos to review.

29. With regard to Santos' claim that Aldazabal had not informed him of his fifth amendment right not to testify, Aldazabal stated that, in every case that he tries, he makes a record with the Court of his advice to his client in this regard. This exchange between government's counsel and Aldazabal at the March 6th hearing confirms that Aldazabal followed his general practice in this case:

> Q. If I can direct you, sir, to the record, it would be -- I think it is -- . . . It is docket entry 85, page 71. I would like you to take a look, where it says -- starting with the Court: "It's 2:20, you have had a lot of time to consult with your client. What is your client's decision?"

> A. Yes, and I tell Judge Moreno, "Your Honor, I advised my client, under our law, he has no duty to testify at all, the Fifth Amendment allows him not to testify and it cannot be used against him by the Prosecution in their closing argument. I have also advised him of the procedure of testifying. He understands it and as he did from day one, when I started representing him as CJA Counsel, he has indicated to me that he wishes to testify."
> Q. Okay. So that's what you informed the Defendant of in open court, correct, during the trial?
> A. That's what I put on the record, I always do because these things tend to come back in these 2255s. I also advised him that the decision to testify was his and his alone. And I also advised him, as he testified, if he were to say something that the Judge considered may have not been totally true, that Judge Moreno would be very severe with him at sentencing, as well as the fact that the Government probably would ask for an obstruction of justice enhancement of two points in his PSI, which I don't remember, but I'm almost sure that they did.
> Q. Now, just so we are clear, he had indicated to you, right from the start, he wanted to testify. There was no hesitation about that, correct?
>
> ***
>
> A. Yes, he did. He said he was totally innocent of the charges and that he wished to go to trial and we prepared, from the beginning, to do that.

See Transcript [D.E. 15 at 57:2-58:16].

30. With regard to Caridad Pizzorno's deposition, Aldazabal's strategy was to attack her testimony as false.

31. The stipulation regarding Caridad Pizzorno's failure to identify Santos on two occasions, which was required by Judge Moreno and agreed to by the parties, was true.

32. With regard to Santos' contention that Aldazabal should have directed the jury to the insulin logs for Eulalia Garcia and Rolando Arece, Aldazabal explained that the most harmful evidence to Santos' defense was the overlapping of the visit records. When he discussed this issue with his client, Santos said that the entries were clerical errors and, in closing argument, Aldazabal was bound to argue that testimony, which he did.

33. As to the glucose tolerance test ordered by Dr. Krieger for Klebe De La Cruz, the test took place outside the period of the conspiracy, so it would not have been relevant or admissible. Aldazabal follows the rules of evidence and would not try to fool the Court by

15

attempting to introduce something that was not admissible.

34. With regard to Dr. Krieger, Aldazabal admitted that, during the course of her direct testimony, Santos attempted to talk to him about glucose and tests and that he told Santos to please be quiet until the end of the testimony.

35. With regard to Santos' claim that Aldazabal failed to bring out that Caridad Pizzorno qualified for homebound services, being homebound was only one of the elements and the diabetes and the insulin were also part of the government's case.

## CONCLUSIONS OF LAW

### *1. Santos has not satisfied the performance prong under Strickland*

The undersigned concludes that Aldazabal's performance was not deficient because it was not outside the wide range of professionally competent assistance. Strickland, 466 U.S. at 690.

Based on the foregoing factual findings, there is no predicate for a number of Santos' claims because:

- Aldazabal spent a significant amount of time conferring with Santos, either in person or by telephone.

- Aldazabal adequately advised Santos of his right not to testify at trial.

- Aldazabal made the medical records of Caridad Pizzorno and Klebe De La Cruz available for Santos to review.

- The glucose tolerance test administered by Dr. Krieger to Klebe De La Cruz fell outside the time frame of the conspiracy.

- The stipulation regarding Caridad Pizzorno's failure to identify Santos on two occasions was true.

- The jury heard testimony regarding Medicare requirements for homebound patients.

- The jury heard Betsaydis Emil testify that she had falsified nursing notes.

- Santos completed OASIS certifications for both Caridad Pizzorno and Klebe De La Cruz.

Additionally, given Aldazabal's status as an experienced criminal defense attorney, there is a very strong presumption that his performance fell within the wide range of reasonable professional assistance and that the challenged actions might be considered sound trial strategy. Strickland, 466 U.S. at 689; Chandler, 218 F.3d at 1316. Santos did not overcome this presumption. Viewing the record as a whole, the undersigned concludes that none of Aldazabal's actions challenged by Santos were of the kind that no competent counsel would have taken. Grayson, 257 F.3d at 1216. Therefore, Santos does not meet the performance prong.

### 2. *Santos has not satisfied the prejudice prong under Strickland*

Assuming, *arguendo*, that Aldazabal's performance was, in some way, deficient, Santos cannot satisfy the prejudice prong because there is no reasonable probability that the outcome of Santos' trial would have been different absent any such deficiency. Strickland, 466 U.S. at 694.

At trial, the government presented evidence that Caridad Pizzorno and Klebe De La Cruz did not have diabetes and did not require insulin injections. Although Santos testified that he had regularly administered insulin to these patients, the government's expert testified that a non-diabetic injected with insulin twice a day, seven days a week was likely to suffer serious adverse effects, such as shakiness, sweatiness, desperate feelings of hunger, confusion, seizures, coma and even death from low blood sugar. See Trial Transcript [Case No. 11-20101, D.E. 85 at 116:24-117:11]. Additionally, according to Aldazabal, the most harmful evidence to Santos' defense was the overlapping of the visit records for Eulalia Garcia and Rolando Arece, which Santos chose to explain as clerical error. Santos' trial testimony and Motion to Vacate testimony have been found untruthful by Judge Moreno and the undersigned, respectively. It is not

unreasonable to conclude that the jury also found Santos' testimony not credible. Hence, there is no reasonable probability that Santos would have been acquitted absent Aldazabal's purportedly deficient performance. Therefore, Santos does not meet the prejudice prong.

### RECOMMENDATION

Because Santos has not satisfied the Strickland performance and prejudice prongs, his claim of ineffective assistance of counsel under 28 U.S.C. § 2255 fails. Therefore, the undersigned RESPECTFULLY RECOMMENDS that Santos' Motion to Vacate be DENIED. The parties have **fourteen (14) days** from the date of receipt of this Report and Recommendation within which to serve and file objections, if any, with the Honorable Federico A. Moreno, United States District Judge. See Local Magistrate Rule 4(b). Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. See Resolution Trust Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 14th day of July, 2014.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
United States District Judge Federico A. Moreno
Counsel of Record